UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.                                        No. 2:16-CR-20035

ROBERT BRYAN VAUGHN                                                                        DEFENDANT

## OPINION AND ORDER

Before the Court is Defendant Robert Bryan Vaughn's motion and brief (Doc. 43) requesting early release from incarceration in light of the COVID-19 pandemic presently affecting the United States and other countries around the world. The Government has filed a response (Doc. 46) in opposition and Mr. Vaughn has filed a reply (Doc. 48) with leave of Court, which he subsequently amended (Doc. 49) in order to append an exhibit that was inadvertently omitted from the original and to clarify his argument regarding his particular medical and custodial circumstances. The Court has reviewed the final presentence investigation report (Doc. 33), the sentencing memoranda (Docs. 35 and 36) submitted by the parties in advance of sentencing, the transcript (Doc. 41) of the sentencing hearing, and the judgment (Doc. 39) and statement of reasons (Doc. 40) entered following Mr. Vaughn's sentencing hearing. The Court has also reviewed three articles[1] published on the Internet, which Mr. Vaughn's attorney has provided to clarify the factual

---

[1] The submission of articles was by email to the Court and Government. Although this method of submission is somewhat unorthodox and is discouraged in the future because of the risk that the record of items the Court considered will be incomplete, due to the emergency nature of Mr. Vaughn's request for relief and because the Court requested expedited briefing from the parties, the Court will consider these articles as if they had been appended as exhibits to the reply. The articles, each of which was last accessed April 13, 2020, are: Ross Todd, *With COVID-19 Cases at Santa Rita Jail on the Rise, Federal Magistrates Reconsider Detention Practices*, The Recorder (Apr. 10, 2020) (available at https://www.law.com/therecorder/2020/04/10/with-covid-19-cases-at-santa-rita-jail-on-the-rise-federal-magistrates-reconsider-detention-decisions/?slreturn=20200313112258); Walter Pavlo, *Bureau of Prisons Moving Minimum Security Inmates To Isolation For Release Preparation*, Forbes (Apr. 11, 2020) (available at

1

circumstances affecting his motion.

I. **Background**

On June 27, 2017, the Court sentenced Mr. Vaughn to 135 months of imprisonment and 5 years of supervised release on the basis of Mr. Vaughn's plea of guilty to using interstate commerce to entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b). The statutory penalties applicable to Mr. Vaughn's offense were a mandatory minimum term of imprisonment of 10 years and a maximum term of life and a mandatory minimum term of supervised release of 5 years. The United States Sentencing Guidelines range calculated on the basis of Mr. Vaughn's offense of conviction and relevant conduct was a term of imprisonment of 210 to 262 months and a term of supervised release of 5 years to life. At sentencing, the Court noted some mitigating factors and its disagreement with the manner in which the guidelines apply to child pornography and enticement of minors cases, but also recognized the need to protect the public from future misconduct and for Mr. Vaughn's sentence to reflect the seriousness of his offense. Though the Court varied downward from the guidelines-recommended range, the sentence imposed was in excess of the statutory mandatory minimum. Mr. Vaughn is presently serving his sentence of imprisonment in Bureau of Prisons custody at FCI Sandstone, a low-security facility in Sandstone, Minnesota.

II. **Motion for Release**

In light of the COVID-19 pandemic and its effect on BOP operations, staff, and inmates, Mr. Vaughn moves for early release from imprisonment, or transfer to home confinement. Mr.

---

https://www.forbes.com/sites/walterpavlo/2020/04/11/bureau-of-prisons-moving-minimum-security-inmates-to-isolation-for-release-preparation/#550a93784ca6); and Nick Pinto, *Internal Prison Guard Email Contradicts Government's Claims to Judges About Containing Coronavirus at Federal Detention Center*, The Intercept (Apr. 10, 2020) (available at https://theintercept.com/2020/04/10/prison-coronavirus-mdc-bop/).

Vaughn argues that continued imprisonment violates his Eighth Amendment right to be free from cruel and unusual punishment and his Fifth Amendment[2] right to due process. Mr. Vaughn also moves for modification of his term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A).

### A. Constitutional Basis for Release

There is no dispute that federal courts have jurisdiction to remedy postsentencing violations of constitutional rights by the federal government.

> [W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done. . . . Thus, the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another. For this reason the district court has jurisdiction.

*Bell v. Hood*, 327 U.S. 678, 684–85 (1946). The accepted procedural vehicle to bring a dispute before the Court and invoke its jurisdiction to impose a non-damages remedy for constitutional violations typically is through a civil action for injunctive relief[3] or a motion to vacate, set aside, or correct a sentence in a criminal case pursuant to 28 U.S.C. § 2255.

Setting aside the question of whether the instant motion is adequate to place a matter within the Court's jurisdiction in the best procedural posture for resolution of that matter, in light of present circumstances Mr. Vaughn's constitutional claims fail on their merits. Mr. Vaughn's

---

[2] Most of the law on deprivation by prison officials of life, liberty, or property without due process has developed in cases involving the several states, and so Mr. Vaughn cites to the Fourteenth Amendment guarantee of due process. Because the BOP is a federal agency, it is the Fifth Amendment right to due process that is implicated by Mr. Vaughn's motion, but source of recognition notwithstanding, the substance of the right to due process recognized by these amendments is the same.

[3] Such actions have proceeded in the courts of this country since its beginning. *See, e.g.*, *United States v. Lee*, 106 U.S. 196 (1882) (citing with approval case law supporting the proposition that officers of the United States may be enjoined from committing constitutional violations).

Eighth Amendment argument cites to *Helling v. McKinney* and its progeny for the proposition that his continued detention under conditions exposing him to future risk of contracting COVID-19 gives rise to a claim that the conditions of his confinement constitution cruel and unusual punishment, and injunctive relief is available as a remedy. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993) ("We affirm the holding of the Court of Appeals that McKinney states a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of [Environmental Tobacco Smoke] that pose an unreasonable risk of serious damage to his future health."). Whatever due process rights Mr. Vaughn has that are implicated by the conditions of his confinement and the potential risks he faces, those Fifth Amendment rights are coextensive with his Eighth Amendment rights. *See Butler v. Fletcher*, 465 F.3d 340, 344–45 (8th Cir. 2006) (applying deliberate indifference standard to Due Process claims and explaining that when a governmental duty "is grounded in principles of safety and general well-being . . . [p]retrial detainees and convicted inmates, like all persons in custody, have the same right to these basic human needs. Thus, the same standard of care is appropriate").

"[W]hatever its exact contours, deliberate indifference requires a highly culpable state of mind approaching actual intent." *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993). It is "more than mere negligence" but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exits, and he must also draw the inference." *Id*. at 837.

Accepting the facts alleged in and implied by Mr. Vaughn's motion and supporting

4

documents, no showing has been made that the Government is acting with deliberate indifference to the risk posed by this pandemic to Mr. Vaughn. The Government's system-wide actions have not been taken in disregard of the known risks to inmate health and safety, but rather directly in response to those risks. The Attorney General has issued a memorandum to BOP directing that review begin immediately and transfer to home confinement be expedited for appropriate inmates, prioritized by worst-affected facilities. Memorandum of Attorney General William Barr to Director of Bureau of Prisons (Apr. 3, 2020) (available at https://www.justice.gov/file/1266661/download). BOP facilities have essentially locked down all inmates, restricting their movement throughout the facilities in which they are incarcerated in an effort to decrease the rate at which the disease spreads throughout the inmate population. Bureau of Prisons, COVID-19 Action Plan: Phase Five (Mar. 31, 2020) (available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp). Under the facts in this case, the risks known to the Government affect the inmate population generally, and so the Government's general response cannot be said to disregard those risks. The facts Mr. Vaughn draws attention to would support an argument that the Government's response to this pandemic prior to these steps has been inadequate, not only with respect to inmates in BOP custody, but generally. The ultimate adequacy of a response clearly intended to address the risk, however, is not the measure of deliberate indifference. As a measure of state of mind, deliberate indifference "must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (quoting *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011)). Under the facts present in this case to date, the Eighth and Fifth Amendments provide no recourse.

    **B.**    **Statutory Basis for Release**

The Government incorrectly argues that the Court lacks jurisdiction to hear this motion

filed pursuant to 18 U.S.C. § 3582(c). Rather, as the Government notes, § 3582(c)(1)(A) explicitly confers jurisdiction in this Court to consider motions to reduce sentences. Prior to the passage of the First Step Act, that conferral of jurisdiction was limited to motions made by the Director of the Bureau of Prisons. Now, however, the Court may also hear motions made by defendants, subject to an exhaustion requirement or a period of 30 days of inaction by the warden of the defendant's facility following receipt of a request from the defendant that the Director move for a reduced sentence on behalf of the defendant. Consistent with guidance from the Supreme Court, noted by the Government, the Court declines to read this exhaustion or inactivity period as a jurisdictional bar. *See Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (reiterating that "a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal-jurisdiction"). Rather, it is very clearly a claim-processing rule—a "rule[] that seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Id.*—and if the Government is to rely on it, the exhaustion requirement must be raised as a defense.

The Government has done so here, but this does not end the Court's inquiry. Defenses may be waived, and in some cases equitable considerations may estop a party from raising them. To be sure, it is not clear that waiver or equity should preclude the Government from raising the defense in Mr. Vaughn's case. There are factors in this case that may support that outcome—for example, Mr. Vaughn is essentially locked down as a result of the Government's pandemic response, rather than as a result of any misbehavior on his part, and it is not clear that he has access to the Bureau's mechanism for requesting that the Director move to reduce Mr. Vaughn's sentence.

The Court need not analyze whether the circumstances in this case support a finding of waiver or estoppel, however, because assuming without deciding that the Court may proceed to

6

the merits of Mr. Vaughn's motion, the motion will be denied.

Before granting a motion under § 3582(c)(1)(A), the Court must find extraordinary and compelling reasons warrant a reduction or that the defendant is at least 70, has served at least 30 years in prison on his current offense, and a determination has been made by the Director of the BOP that the defendant is not a danger. This finding can only be made in light of a consideration of whichever sentencing factors from 18 U.S.C. § 3553(a) are relevant and any reduction granted must be consistent with applicable policy statements issued by the Sentencing Commission.

There is no doubt that the circumstances present during this pandemic create extraordinary and compelling reasons that would justify a reduction of sentence in many cases. After a consideration of the § 3553(a) factors, however, that reduction is not justified in Mr. Vaughn's case. The mitigating factors Mr. Vaughn raises—his exemplary military service and related PTSD, his own history as a victim of childhood trauma, and his prior law-abiding behavior—justified the downward variance he received at sentencing. A consideration of the remaining factors, even in light of this pandemic, does not justify a further reduction. In particular, and despite defense counsel Mosemarie Boyd's strong advocacy on Mr. Vaughn's behalf on this point, the Court finds that "the need for the sentence imposed to protect the public from further crimes of the defendant" persists. 18 U.S.C. § 3553(a)(2)(C).

A review of the pertinent offense conduct from the presentence investigation report (Doc. 33, pp. 5–9) makes clear the nature of the risk posed by Mr. Vaughn. Mr. Vaughn's conviction resulted from his interaction in 2016 with an undercover officer chatting on the Internet website "Motherless." The undercover officer posed as a single mother with two minor children under the age of 10, interested in sexual activity and incest. Mr. Vaughn communicated his belief that age and family should not be a barrier to sexual activity. Chats on Motherless were interrupted for a

7

time after Mr. Vaughn was banned from the Motherless website under the username he had used at the beginning of his communication with the undercover officer. He believed this ban was due to his talking about wanting to have sex with girls younger than 17 years old. Mr. Vaughn and the undercover officer continued with their chats, and also began to chat on Yahoo messenger. Mr. Vaughn proceeded to send photos of himself to the officer, including photos depicting him nude with an erect penis. Mr. Vaughn had several discussions with the undercover officer communicating his desire to join her family and practice incest with her children by engaging in oral, anal, and vaginal sex. He also expressed a desire to impregnate the undercover officer and perform sexual acts on the resulting child, from infancy. Approximately four months after their communications began, Mr. Vaughn told the undercover officer he wanted to come visit and engage in sexual activity with her daughter.

Mr. Vaughn also expressed a desire to film the sexual activity involving him, the undercover officer, and the children. He wanted to film all the "first" acts with the children, and to "train" the daughter in sexual activity ranging from "soft stuff" to "hardcore bdsm (which stands for bondage, discipline, sadism, and masochism) stuff." Mr. Vaughn expressed concerns about impregnating the undercover officer's daughter, and expressed his desire to have sex multiple times each day. He admitted to masturbating multiple times each day, and to fantasizing about the undercover officer's children while doing so. He stated that he wanted to use sex toys on the children and watch pornography with them. He confessed to his possession of child pornography, and reflecting on the contents of his collection of child pornography, stated he probably could not refuse an opportunity to having sex with a 4-year-old.

Mr. Vaughn was aware of the possibility that he was being tricked, and communicated his knowledge of the risks he was posing to himself when discussing underage sex. Mr. Vaughn and

8

the undercover officer made plans to meet, with the understanding being that the undercover officer would bring her children to Nebraska for Halloween. Mr. Vaughn spoke about dressing the undercover officer's daughter in a sexual costume. Thereafter Mr. Vaughn communicated to her that every time he saw another child, he fantasized about sexual activity with her children, and that he had since been staring at teenaged and younger girls in public, at the grocery store, the swimming pool, or elsewhere and taking a sexual interest in those children's bodies. He also communicated that he had been viewing child pornography and was worried about being caught by law enforcement. He and the undercover officer discussed getting a hotel room for one night of her visit, during which Mr. Vaughn would engage in sexual activity with the undercover officer and her children. Mr. Vaughn sent possible costumes for the undercover officer's daughter to wear, and in October, Mr. Vaughn reserved a hotel room for the visit. He asked the undercover officer specific questions about her daughter's sexual development and knowledge, and agreed to meet with her for breakfast near the hotel at the beginning of her visit. He communicated excitement that his first homosexual experience would be with the undercover officer's minor son.

Mr. Vaughn was arrested when he arrived for the scheduled breakfast.

A search warrant of his residence resulted in the discovery of numerous sex toys, including toys intended for use in BDSM sexual activity, normal children's toys, Halloween costumes, and numerous digital devices containing depictions of child pornography, none of which involved sex acts with animals, toddlers, or infants, and none of which depicted sadistic or masochistic conduct.

Mr. Vaughn's offense of conviction involved decoy minors, rather than actual victims, but consideration of the affirmative steps Mr. Vaughn took during the commission of the offense and his communications with the undercover officer make clear now, as it was at sentencing, that he intended to commit hands-on offenses against minor children. His communications and possession

of child pornography reveal that his sexual desires were not limited to the specific minors he believed he would be able to sexually assault in 2016. Although Mr. Vaughn considers his misconduct "a serious mistake, he has learned from it, and he intends to seek mental wellness help" (Doc. 43, p. 12), the record is absent of affirmative rehabilitative steps or progress. Under these circumstances, recidivism seems likely.

The Court agrees with defense counsel that a substantial reduction in the number of individuals incarcerated in BOP facilities would likely reduce the system-wide threat posed to prisoners by COVID-19. However, in light of the Court's finding that Mr. Vaughn continues to pose a substantial risk of harm through recidivism, the Court cannot find that extraordinary and compelling reasons warrant a reduction in his case.

IT IS THEREFORE ORDERED that Defendant's motion (Doc. 43) is DENIED.

IT IS SO ORDERED this 14th day of April, 2020.

*/s/ P. K. Holmes, III*
P.K. HOLMES, III
U.S. DISTRICT JUDGE